# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

PRATT LAND & DEVELOPMENT, LLC,    )
                                  )        Case No. 1:19-cv-10
        *Plaintiff*,              )
                                  )        Judge Atchley
v.                                )
                                  )        Magistrate Judge Lee
CITY OF CHATTANOOGA, *et al.*,    )
                                  )
        *Defendants*.             )

## MEMORANDUM OPINION AND ORDER

Before the Court are the Motion for Summary Judgment [Doc. 75] of Plaintiff Pratt Land & Development, LLC ("PLD"); PLD's Motion for Hearing [Doc. 78]; the First Motion for Summary Judgment [Doc. 91] of Defendants City of Chattanooga ("the City"), City of Chattanooga City Council, and Chip Henderson; and Plaintiff's Motion for Hearing [Doc. 111] on Defendants' Motion for Summary Judgment.

The extensive briefing and record in this case and the wealth of case law on the issues presented in the summary judgment motions make oral argument unnecessary. Plaintiff's Motions for Hearing [Doc. 78 & 111] are therefore denied. For reasons that follow, Plaintiff's Motion for Summary Judgment [Doc. 75] will be **DENIED** and the City's First Motion for Summary Judgment [Doc. 91] will be **GRANTED IN PART** and **DENIED IN PART**.

## I.    FACTUAL BACKGROUND

This action concerns the October 2018 rezoning of an approximately 2.6 acre plot of land located at 1001 Reads Lake Road (the "Clubhouse Parcel"). [Doc. 1-1 at ¶ 17; Doc. 83-34; Doc. 82-4 at ¶ 6].[1] The subject property was a small piece of the larger Quarry Golf Course property

---

[1] For consistency and ease of reference, record citations are to the CM/ECF-stamped document and page number, not to the internal pagination of any filed document. Where possible, further citation is made to more specific subdivisions

and housed offices and a clubhouse. [*Id.*; Doc. 75-2 at 3-4]. After learning of the potential sale to PLD and redevelopment of the Clubhouse Parcel into multifamily housing, members of the community organized opposition to the redevelopment of the parcel. [*See, e.g.,* Docs. 83-1]. Chattanooga City Councilman Chip Henderson became aware of that opposition and introduced a resolution that led to the eventual rezoning of the Clubhouse Parcel. [Doc. 75-8 at 5-6, 24, 38]. The attention the development received also revealed the zoning history of the Clubhouse Parcel and what Henderson believed was a defective notice relating to a prior rezoning. [*Id.* at 26]. The Chattanooga City Council eventually approved Ordinance #13377, amending the Chattanooga City Code, Zoning Ordinance so as to rezone the Clubhouse Parcel to include conditions that, *inter alia*, prohibited multifamily uses. [Doc. 75-13; Doc. 83-34 at 2]. A close review of the history of the property is required to understand the parties' claims.

### A. Zoning History of the Clubhouse Parcel

The Quarry Golf Course began operating on Reads Lake Road in the early 1970s. [Doc. 83-7]. The overall property is approximately 52 acres, including the 2.6 acre parcel that is the subject of this litigation. [Doc. 82-4 at ¶ 3]. Prior to 1977, the Clubhouse Parcel was zoned R-1, along with the rest of the golf course. [Doc. 83-9]. In 1977, the owner requested rezoning of the Clubhouse Parcel to accommodate offices in the clubhouse. [Doc. 83-9 at 1; Doc. 110-6 at 10]. Staff recommended approval of a rezone from R-1 Residential Zone to R-4 Residential Special Zone, citing the following reasons:

- The offices and clubhouse would be compatible uses in this area.

- Approval of this request is not expected to encourage further such applications for rezoning along Reads Lake Road or Mountain Creek Road.

within a document, such as the paragraph number of an affidavit or the original page number of a compressed transcript.

- Approval should not effect [sic] the pattern or character of development of this area.

[Doc. 83-9 at 2]. The Planning Commission approved the recommendation. [*Id.*]. The Commission identified surrounding development as "Golf Course, Apartments." [*Id.*]. The Land Use Plan "show[ed] area being used for residential open space purposes." [*Id.*].

In 1980, the Planning Commission approved a request to rezone the Clubhouse Parcel from R-4 Special Zone to C-1 Highway Commercial Zone. [Doc. 83-14 at 3]. The property owner sought rezoning to accommodate a bar in the restaurant / clubhouse.[2] The staff recommendation noted that the zoning was not in accordance with the land use plan. [*Id.*]. The recommendation states:

A. The building is not really suited to any use other than commercial.

B. The proposed use would be compatible with the area development. The site is somewhat isolated and should not create any traffic problems usually associated with commercial development.

C. *We consider this an isolated case with very unusual circumstances* which warrant favorable consideration; however, we are in no way condoning general commercial zoning for this area. This is still a residential neighborhood and we would hope that any future cases would be considered under their own merit without this action being an influencing factor.

[Doc. 83-14 at 3] (emphasis added). An ordinance effectuating this change was passed on September 16, 1980. [Doc. 83-14 at 5]. The Clubhouse Parcel was zoned C-1 Highway Commercial zone from 1980 to 2002. [Doc. 82-4 at ¶ 7]. Residential use was not permitted under the C-1 Highway Commercial zoning. [Doc. 83-11 at 3, pg. 108].

**B. 2002 Mass Rezoning**

In 2002, the property was again rezoned as part of a mass rezoning for several hundred properties following an amendment to the City of Chattanooga Zoning Ordinance. [Doc. 83-10;

---

[2] The Rezoning Request is largely illegible, but there does not appear to be any dispute that the Clubhouse Parcel was rezoned to permit the owner to have a bar and/or serve beer in the clubhouse.

82-1 at ¶ 2]. C-1 and C-6 Zones were eliminated from the Chattanooga Zoning Ordinance and all properties with this zoning were rezoned to C-2 Convenience Commercial Zone. [Doc. 83-10 at 1]. Roughly 600 properties were included in the mass rezoning. [Doc. 82-1 at ¶ 3].[3]

The C-2 Convenience Commercial Zone exists to promote "the clustering and development of businesses, offices, and service facilities to serve the demand for goods and services generated both by area residents and by transients traveling to or from other neighborhoods or places of employment." City of Chattanooga Code, Division 13 – C.2 Convenience Commercial Zone, Sec. 38-181 (1995); [Doc. 83-38]. The principal permitted uses of the zone include, among other things, retail and service establishments, dwellings other than manufactured homes, bowling alleys, banks, office buildings, restaurants, hospitals, and commercial signs and billboards. *Id.* At some point the adjacent golf course was closed to the public. [Doc. 82-4 at ¶ 5]. As compared to C-1, C-2 is "very wide open," permitting more uses than would be permitted in C-1. [Doc. 83-11 at 3, pg. 107].

In connection with the mass rezoning, the City of Chattanooga published a legal notice that the Planning Commission was holding a hearing regarding the rezoning (the "2002 Notice"). [Doc. 83-11 at 4, pg. 133]. The notice did not identify specific properties that would be discussed or include addresses for the affected properties. [*Id.* at 5, pg. 134]. Owners of the properties subject to rezoning did receive a letter about the rezoning of their property, but adjacent property owners did not. [*Id.* at 5, pg. 135]. The minutes of the January 14, 2002, City Council meeting indicate that there was no opposition to the rezoning. [*Id.* at 5, pg. 136]. Bryan Shults, Senior Planner for the City of Chattanooga, testified that this was somewhat surprising, as opposition to zoning

---

[3] The number of properties subject to the 2002 Rezoning is estimated as 600 in numerous places in the record. Defendant submitted the list of properties and the affidavit of John Bridger that only about 300 were rezoned. [Doc. 83-27; Doc. 82-1 at ¶ 3]. Plaintiff does not rebut this evidence. To the extent there is a fact dispute on this issue, it is not material. For the purpose of resolving the Motions, the Court will assume the 2002 rezoning affected approximately 600 properties, as PLD appears to contend.

4

changes is fairly common. [*Id.*].

### C. Pratt's Proposed Development & Opposition

By way of background, the Chattanooga-Hamilton County Regional Planning Agency ("RPA") is a joint agency of the City of Chattanooga and Hamilton County.[4] The staff is made up of professional city planners, urban designers, graphic designers, and administrative personnel. The RPA serves as staff to the Chattanooga-Hamilton County Regional Planning Commission (the "Planning Commission"). The Planning Commission in turn makes zoning and land use recommendations to local legislative bodies, such as the Chattanooga City Council. At the time of the rezoning that is the subject of this action, the Planning Commission was comprised largely of elected officials or their representatives, developers, builders, and real estate agents. [Doc. 83-28 at 2]. John Bridger was the Executive Director of the RPA. [Doc. 82-1 at ¶ 1]. Bryan Shults was the Senior Planner for the City of Chattanooga, having previously served as Senior Planner and then Subdivision Coordinator at the RPA. [Doc. 82-4 at ¶ 1].

Pratt & Associates, LLC, was started by James E. Pratt, Jr., and his son Win Pratt in the 1990s. [Doc. 110-6 at 3-4]. Pratt Homes, LLC, Pratt Home Builders, LLC, and Pratt Land & Development, LLC, are also Pratt entities. [*Id.*]. The Pratts own these companies and Win Pratt is the President of each. [Doc. 75-2 at 3; Doc. 83-25 at 10]. PLD is the land development branch of the Pratt Companies. Win Pratt testified that the original intent in purchasing the Clubhouse Parcel was to develop some sort of multifamily product. [Doc. 110-7 at 3].

**December 19, 2017**: Pratt Homebuilders, LLC, as buyer, executed a Commercial Purchase

---

4 This framework is implicit but not succinctly stated in the parties' briefing. Pursuant to Federal Rule of Evidence 201, the Court takes judicial notice of these facts because they are not reasonably disputed, are generally known within the Court's territorial jurisdiction, and can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned, specifically, the website of the Chattanooga-Hamilton County Regional Planning Commission. *See* Fed. R. Evid. 201(b); https://chcrpa.org/about-us/.

and Sale Agreement to purchase the Clubhouse Parcel and larger surrounding property from Landham Norman, Inc. [Doc. 83-16]. The purchase and sale agreement was contingent upon obtaining Hamilton County zoning approval. [Doc. 83-16 at 7]. The seller retained the right to maintain possession of the clubhouse / office located on the Parcel for up to nine months after closing, rent free. [*Id.*].

**February 2018**: In late February 2018, "Pratt & Assoc" filed two applications with the City of Chattanooga. [Doc. 110-9]. One was an application for rezoning of the Clubhouse Property from C-2 Convenience Commercial to R-4, which allows residential townhomes and apartments. [Doc. 75-4 at 3; Doc. 75-2 at 8]. The second was a Planned Unit Development ("PUD") application, seeking approval for residential development and ancillary uses at 1001 Reads Lake Road. [Doc. 110-9; Doc. 83-24 at 1, pg. 86]. The purpose of a PUD is to "provide the opportunities to create more desirable environments through the application of flexible and diversified land development standards under a comprehensive plan and program professionally prepared." [Doc. 75-14 at 5]. The PUD application includes the Clubhouse Parcel.

**March 29, 2018**: On March 29, 2018, PLD held a community meeting at Red Bank Elementary School regarding its proposed redevelopment of the Quarry Golf Course. [Doc. 110-3 at 4; Doc. 83-1 at 2, ¶ 5; Doc. 83-24 at 5, pg. 219]. City Councilman for the district in which the Parcel lies, Chip Henderson, was present at the meeting. [Doc. 75-8 at 14; Doc. 110-2 at 3]. Members of the community became aware of the proposed redevelopment at the meeting and voiced opposition to it. [*See, e.g.,* Docs. 83-1, 83-2, 83-3, 83-4, 83-5]. Specifically, they were "not wanting to see any more apartments north of Reads Lake Road." [Doc. 75-8 at 14].

After attending the meeting or becoming aware of the proposal, a group called "Friends of Mountain Creek" organized to raise funds and enlist others to oppose the introduction of additional

multifamily units and rentals in the neighborhood. [*Id.*]; *see e.g.,* [Doc. 83-5 at 2, ¶ 7]. FOMC also decided to investigate the 2002 zoning change to see if any of the other properties that were impacted were located in a residential area like the Clubhouse Parcel. [*Id.* at 3, ¶ 7]. Steve Hunt and Rick Thompson, both of whom own homes near the Clubhouse Parcel, became involved with the FOMC. Steve Hunt is the managing partner of a real estate brokerage and property management firm. [Doc. 83-5 at ¶ 3]. Both Thompson and Hunt later became part of a committee organized to facilitate discussion between FOMC and the Pratt Companies. [Doc. 83-24 at 3, pg. 98; Doc. 83-5 at ¶ 7; Doc. 83-6 at ¶ 7].

During this time, Councilman Henderson became aware of the zoning history of the Clubhouse Parcel. [Doc. 75-8 at 13]. Concerned the 2002 Notice was improper, Henderson then met with the City's Attorney's Office and John Bridger to develop language for a resolution that would direct the RPA staff to file a zoning application requesting conditions be placed on the Clubhouse Parcel. [Doc. 75-8 at 12].

**April 9, 2018**: On April 9, 2018, the Planning Commission held a hearing on PLD's PUD application and Clubhouse Parcel rezoning request. [Doc. 83-17 at 3]. Prior to the meeting, the RPA staff reviewed PLD's applications and prepared a staff report on the PUD.[5] The staff recommended deferring the PUD application due to concerns regarding, *inter alia*, use of detention ponds / the floodway as community space, pedestrian connections, and stream buffers. [Doc. 75-14 at 5]. The staff recommended approving rezoning of the Clubhouse Parcel to R-4. [Doc. 75-6].

At the meeting, Bryan Shults gave a presentation regarding the requests and the properties. [Doc. 83-17 at 3-4]. He explained the RPA's recommendation that the rezoning of the Clubhouse Parcel be approved subject to a condition prohibiting a drive-thru and that the PUD application be

---

[5] It is not clear if a separate staff report was also prepared for the rezoning request. If so, it does not appear to be in the record.

deferred. [*Id.*]. Steve Hunt spoke in opposition to the applications. [*Id.*]. Based on the number of community members that attended the meeting, James Pratt testified "it was pretty obvious to me on the 9th of April that we had a lot of opposition." [Doc. 83-24 at 5, pg. 219]. James Pratt requested to withdraw both applications, and the withdrawal was accepted by the Commission. [Doc. 83-17 at 3-4; Doc. 83-24 at 1, pg. 87]. PLD did not resubmit a PUD or rezoning application with respect to the property thereafter. [Doc. 75-2 at 8].

**April 17, 2018**: On or about April 17, 2018, Steve Hunt, Councilman Henderson, and James Pratt met regarding the property. [Doc. 83-24 at 2, pg. 95]. At that meeting, Henderson told James Pratt he was looking into how to place conditions on the C-2 zoning of the Clubhouse Parcel. *Id.* James Pratt testified that Henderson said the purpose of the resolution was to "take the property back to the zoning status that it was when the previous owner purchased the property." [Doc. 83-24 at 2, pg. 96]. Conversations continued after that meeting. Henderson, James Pratt, Hunt, and Rick Thompson later met to discuss assembling a committee to facilitate discussion between the Pratt Companies and the FOMC / community members. [Doc. 83-24 at 3, pg. 98].

**April 24, 2018:** On April 24, 2018, the Chattanooga City Council passed Resolution No. 29428 directing staff "to develop conditional language and directing the City Attorney's Office on behalf of the City Council to file a zoning application requesting conditions that include office use and any uses consistent with the former C-1 zoning uses to be placed on [the Clubhouse Parcel]." [Doc. 75-9 at 2].

**April 30, 2018**: The City Council, through the City Attorney's Office, filed a Zoning Application on April 30, 2018, consistent with the Council's resolution. [Doc. 75-10]. Brian Shults was tasked with processing the application. [Doc. 75-4 at 5]. Mr. Shults put together a presentation

regarding the history of the Property in anticipation of the Planning Commission's review. [Doc. 75-4 at 6-7].

Representatives of PLD and FOMC continued to discuss possible options through the coming months, and action to rezone the Clubhouse Parcel to C-2 with conditions was delayed several times during that period to facilitate further discussion. [Doc. 83-24 at 3, pgs. 99-100]. After several meetings, communications broke down between FOMC and the Pratt Companies. [Doc. 83-24 at 3, pg. 101; Doc. 110-3 at 12].

**May 18, 2018**: On May 18, 2018, Pratt Homebuilders, LLC,[6] closed on the purchase of the Quarry Golf Course property, including the Clubhouse Parcel. [Doc. 75-2 at 8]. Pursuant to a Limited Warranty Deed entered on May 18, 2018, Landham & Norman conveyed the subject property to Pratt Land & Development, LLC. [Doc. 83-23]. At the time of closing, James Pratt was aware that the City Council was considering down-zoning the Clubhouse Parcel from C-2 to C-2 with conditions. [Doc. 75-2 at 7].

**June 11, 2018**:  The Planning Commission held a public hearing on the City's rezoning application on June 11, 2018, but deferred the hearing to July 9, 2018, again to August 13, 2018, and finally to September 10, 2018. [Doc. 75-11 at 2].

**September 10, 2018**: On September 10, 2018, the Planning Commission held a public hearing on the City's application to rezone the Clubhouse Parcel from C-2 to C-2 with conditions. [Doc. 83-32]. Two representatives of the Pratt Companies spoke in opposition and Steve Hunt spoke in favor of the resolution. [Doc. 83-32 at 3]. The Planning Commission's Resolution notes that it heard and considered all statements regarding the petition, including the opposition thereto.

---

[6] The Purchase and Sale Agreement is between Pratt Homebuilders, LLC, and Landham & Norman, Inc. [Doc. 83-16].

[*Id.*]. The Resolution indicates the Commission studied the petition in relation to existing zoning and land use and potential patterns of development. [*Id.*].

The Planning Commission voted to recommend to the City Council that the rezoning request for the Clubhouse Parcel be denied. [Doc. 75-11]. The Commission determined:

- "[T]hat the request would set the precedent of the City rezoning a single property rather than being included as part of a larger area that is typically requested as part of a zoning study" and

- "[T]hat the request would set the precedent of retroactively imposing conditions on a single property 16 years after the property was rezoned with no conditions."

[Doc. 75-11 at 2].

**October 9, 2018**: On October 9, 2018, Ordinance 13377 to rezone the Clubhouse Parcel from C-2 to C-2 with conditions was discussed at a meeting of the Chattanooga City Council. [Doc. 83-33]. The minutes of the meeting reflect that the RPA Director John Bridger spoke to clarify some questions that had arisen about the Ordinance. [*Id.*]. Bridger explained that there was no RPA staff recommendation because the City Council had passed a resolution directing RPA staff to develop language for the ordinance that would make any uses on the property consistent with the former uses. [*Id.* at 4]. Bridger also addressed the notice of the 2002 rezoning. [Doc. 83-33 at 4]. In response to a question from Councilman Henderson, Bridger stated that it was not very common for a C-2 property to be in the middle of an R-1 area and that C-2 zoning was uncharacteristic in the area. [*Id.*].

City Attorney Phillip Noblett spoke on behalf of the applicant, explaining that the City sought added conditions so that the current C-2 zoning would have the same conditions of former C-1 Highway Commercial zone. [Doc. 83-33 at 4]. Steve Hunt spoke in support of the Ordinance,

citing a petition against multi-family development on the property. [Doc. 83-33 at 5]. Hunt voiced concern that if the property were not rezoned from C-2 to C-2 with conditions, it would allow high density residential in a low-density residential, agricultural area. [*Id.*]. Attorney John Phillips, speaking on behalf of neighboring property owners, argued that the Ordinance brings the Clubhouse Parcel into conformance with neighboring R-1 properties. [Doc. 83-33 at 5]. He argued there was not yet substantial development by PLD sufficient to create a vested right in the property's zoning. [*Id.*].

In opposition, Tom Hazlett spoke on behalf of the Pratt Companies, arguing the rezoning was an illegal action in excess of the City's authority, that apartments were a better use of the property, and that the action was a targeted discriminatory action because none of the other properties that were rezoned in 2002 had conditions placed on them. [*Id.*]. Representatives of the Associated General Contractors of East Tennessee and Home Builders Association also voiced concern for precedent set by a decision to rezone. [*Id.*]. James Pratt also spoke in opposition, arguing the city instigated rezoning after the property was zoned C-2 for 16 years with no complaints from neighboring residents. [*Id.*].

On first reading, the City Council voted to approve the Ordinance by a vote of six to one, with two abstentions. [Doc. 83-33 at 6].

**October 16, 2018**: On October 16, 2018, the City Council held a final reading of the Ordinance. [Doc. 83-34 at 2]. It passed with two abstentions. [*Id.*]. The Ordinance rezones the Clubhouse Parcel from C-2 Convenience Commercial Zone to C-2 Convenience Commercial Zone with conditions. The conditions are "office use and any uses consistent with the former C-1 Highway Commercial Zone." [Doc. 75-13 at 2]. The principal uses of the C-1 Highway Commercial Zone include, *inter alia*, motels and hotels, restaurants, automobile service stations,

11

churches, billboards, laundromats, bus terminals, drug stores, banks, bowling alleys, and theaters. [Doc. 75-2 at 20].

### D. Present Litigation

On December 14, 2018, Pratt Land & Development, LLC, filed a Complaint against the City of Chattanooga, Chattanooga City Council, and Chip Henderson, challenging the Ordinance. [Doc. 1-1]. On January 11, 2019, the action was removed to this Court. Count I seeks a declaratory judgment that the Ordinance is invalid and that the Parcel is returned to its prior zoning classification. [Doc. 1-1 at ¶ 65]. Count II seeks a declaratory judgment that Plaintiff is entitled to develop the Clubhouse Parcel in accordance with the uses permitted by the C-2 Convenience Commercial Zone. [*Id* at ¶ 72]. Plaintiff further asserts state and federal substantive due process claims (Counts III & IV), state and federal equal protection claims (Counts V & VI), state and federal procedural due process claims (Counts VII & VIII), a violation of the takings clause under the Tennessee Constitution (Count IX), an inverse condemnation claim pursuant to Tennessee Code Annotated § 29-16-123 (Count X), and a prayer for attorneys' fees under 42 U.S.C. § 1988 (Count XI). [Doc. 1-1 at 15-31].

On January 25, 2019 [Doc. 12], Defendant Chip Henderson filed a motion to dismiss asserting, *inter alia*, an entitlement to absolute legislative immunity in voting on and passing Resolution 29428. Plaintiff responded in opposition. [Doc. 20].

On April 28, 2020, Plaintiff moved for summary judgment on Counts I, V, and VI – its state and federal equal protection claims and its request for declaratory judgment that the Ordinance is invalid. Defendants responded in opposition. [Doc. 82]. In its reply, Plaintiff states it does not object to the Chattanooga City Council being dismissed as a Defendant. [Doc. 87 at 1, n.1].

On September 20, 2020, the Court found that Henderson was entitled to absolute legislative immunity and dismissed all claims against him in his individual capacity. [Doc. 88 at 10]. Acknowledging that claims against Henderson in his official capacity were synonymous with claims against the City, the Court also dismissed the official capacity claims against Henderson. [*Id.* at 4].

On October 2, 2020, the City of Chattanooga and the City of Chattanooga City Council filed their Motion for Summary Judgment [Doc. 91], seeking dismissal of all claims. On October 5, 2020, the parties filed a consent to mediation. [Doc. 95]. The Court ordered the parties to mediate the action and stayed the case. [Doc. 96]. Following several status reports and extensions of time, the parties reported on February 11, 2021, that mediation had been unsuccessful. [Doc. 108]. Plaintiff filed its response in opposition to summary judgment [Doc. 110] on February 18, 2021. Defendants did not file a reply brief.

Following the Court's dismissal of Defendant Henderson and Plaintiff's concession that the City Council may be dismissed as a Defendant, Plaintiff's Motion for Summary Judgment [Doc. 82] as to Counts I, V, and VI, remains pending only as to the City of Chattanooga. The City's Motion for Summary Judgment [Doc. 91] seeks judgment as to all claims of the Complaint.

## II.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 instructs the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting the presence or absence of genuine issues of material fact must support its position either by "citing to particular parts of materials in the record," including depositions, documents, affidavits or declarations, stipulations, or other materials, or by "showing that the materials cited do not establish the absence or presence

of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56 (c)(1). When ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may discharge this burden either by producing evidence that demonstrates the absence of a genuine issue of material fact or simply "by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Where the movant has satisfied this burden, the nonmoving party cannot "rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing *Matsushita*, 475 U.S. at 586; Fed. R. Civ. P. 56). The nonmoving party must present sufficient probative evidence supporting its claim that disputes over material facts remain and must be resolved by a judge or jury at trial. *Anderson*, 477 U.S. at 248-49 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968)); *see also White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 475-76 (6th Cir. 2010). A mere scintilla of evidence is not enough; there must be evidence from which a jury could reasonably find in favor of the nonmoving party. *Anderson*, 477 U.S. at 252; *Moldowan*, 578 F.3d at 374. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it

has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

III.   **ANALYSIS**

   **A.  Claims against the Chattanooga City Council**

   Based on Plaintiff's concession that the Chattanooga City Council may be dismissed as a defendant [Doc. 87 at 1, n.1], the City's Motion for Summary Judgment [Doc. 91] is **GRANTED IN PART** as to all claims against the Chattanooga City Council.

   **B.  Motion for Judgment on the Pleadings**

   The City brings a Motion for Summary Judgment and Motion for Judgment on the Pleadings [Doc. 91], seeking summary judgment "with respect to the specific issues as to this municipal defendant" and moving for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) on Plaintiff's state law claims. [Doc. 91 at 1]. As Plaintiff points out, the City's brief does not challenge the pleadings, focusing entirely on summary judgment. [Doc. 110 at 25]. PLD asserts that the Court should not consider this as a Rule 12(c) motion, and the Court agrees. "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. Pro. 12(d). Both parties have treated the City's motion as one for summary judgment and submitted extensive evidence in support of their claims. Accordingly, the Court construes the City's Motion for Summary Judgment and Motion for Judgment on the Pleadings [Doc. 91] as a motion for summary judgment under Rule 56.

   **C.  Equal Protection Claims**

   Both parties seek summary judgment as to Plaintiff's equal protection claims. The standard for evaluating a motion for summary judgment does not change when both parties so move. *Craig*

*v. Bridges Bros. Trucking, LLC*, 823 F.3d 382, 387 (6th Cir. 2016). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* (*quoting Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).

"The Equal Protection Clause is essentially a direction that all persons similarly situated should be treated alike." *Andrews v. City of Mentor*, 11 F. 4th 462, 473 (6th Cir. 2021) (cleaned up). To prevail on an equal protection claim, a plaintiff must prove that the government (i) treated the plaintiff disparately as compared to similarly situated persons, and (ii) that the disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis. *Id.*

Here, Plaintiff advances a "class-of-one" equal protection claim. A class-of-one plaintiff can establish that a government action lacks a rational basis either by (i) negativing every conceivable basis which might support the government action, or (ii) demonstrating that the challenged government action was motivated by animus or ill-will. *Shavers v. Almont Twp.*, 832 F. App'x 933, 938 (6th Cir. 2020). "Class-of-one claims are generally viewed skeptically because such claims have the potential to turn into an exercise in which juries are second-guessing the legislative process." *Loesel v. City of Frankenmuth*, 692 F.3d 452, 461 (6th Cir. 2012). As the United States Court of Appeals for the Sixth Circuit has noted, "[i]t is always possible for persons aggrieved by government action to allege . . that they were treated differently from others, with regard to everything from zoning to licensing to speeding to tax evaluation." *Id.* at 462 (quoting *Jennings v. City of Stillwater*, 383 F.3d 1199, 1210-11 (10th Cir. 2004)); *Village of Willowbrook v. Olech*, 528 U.S. 562, 565 (2000) ("Zoning decisions, for example, will often, perhaps almost always, treat one landowner differently from another." (Breyer, J., concurring)). If not carefully circumscribed, the class-of-one equal protection claim "could effectively provide a federal cause

16

of action for review of almost every executive and administrative decision made by state actors." *Loesel*, 692 F.3d at 462. To avoid this outcome, a plaintiff advancing a class-of-one equal protection claim must overcome a heavy burden. *Id.*

The parties appear to agree that Tennessee Courts follow the same analytical framework established by the Supreme Court of the United States in evaluating an equal protection claim. [Doc. 75-1 at 9-10; Doc. 92 at 22].[7] The Supreme Court of Tennessee has held that "Article I, Section 8 and Article XI, Section 8 of the Tennessee Constitution and the Fourth Amendment to the Constitution of the United States confer essentially the same protection upon individuals subject to those provisions." *Tenn. Small School Sys. v. McWherter*, 851 S.W.2d 139, 152 (Tenn. 1993). The court has thus "followed the framework developed by the United States Supreme Court for analyzing equal protection claims." *Id.* at 153. Accordingly, the Court will consider together Plaintiff's equal protection claims under the United States Constitution and the Tennessee Constitution.

### 1. Positions of the Parties

PLD's central claim is that the City singled out the Clubhouse Parcel for rezoning, removing the most compatible and sensible use of the property – residential development – and allowing intensive, incompatible uses. The City contends that the Ordinance preserves 38 years of past and present use, responds to the neighboring property owners' concerns and opposition to multifamily housing, corrects an invalid 2002 rezoning by restoring the land to the use it had prior to that zoning, and preserves the unique character of the community. [Doc. 92 at 19]. PLD argues the Ordinance is not rationally related to any of these concerns. The City urges that the Clubhouse

---

[7] The City states that "under state law, an equal protection violation is much more difficult to prove, requiring a higher level of proof." [Doc. 92 at 22]. The brief does not explain how or in what way the Tennessee Constitution sets a higher bar for equal protection claims. Because Plaintiff's federal equal protection claim cannot survive rational basis review, the Court need not determine if a more exacting standard applies under the Tennessee Constitution.

17

Parcel was uniquely situated, while PLD contends there is no distinction between it and other properties rezoned in 2002.

The City also argues that any "as applied" equal protection challenge is not ripe under the finality doctrine. [Doc. 92 at 20]. PLD believes the City took a definitive position on the zoning of the Clubhouse Parcel, leaving PLD and the City at an impasse such that pursuit of administrative relief would have been futile. [Doc. 110 at 16].

The Court finds that PLD's "as applied" equal protection challenge is ripe for review, because the Ordinance took a definitive position on the zoning of the Clubhouse Parcel. But because correcting the 2002 Notice is a conceivable basis for the Ordinance, Plaintiff's equal protection claim cannot survive rational basis review. Plaintiff has also failed to show that it was treated differently from other property owners who were similarly situated in all material respects.

### 2. Ripeness of As-Applied Challenge

According to the City, PLD's as-applied equal protection claim is not ripe under the finality doctrine set forth in *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172, 186 (1985). [Doc. 92 at 20]. PLD argues that under Sixth Circuit precedent, it was not required to submit an application for the sake of doing so, as the parties had reached an impasse and further proceedings would have been unproductive. [Doc. 110 at 16].

"The finality requirement ensures that an alleged taking," or here, equal protection violation, "has sufficiently crystalized to enable review of the merits." *Lilly Invs. v. City of Rochester*, 674 F. App'x 523, 526 (6th Cir. 2017). Whether a regulation exceeds constitutional bounds "simply cannot be resolved in definitive terms until the court knows the extent of permitted development on the land in question." *Id.* (*quoting Palazzolo v. Rhode Island*, 533 U.S. 606, 618 (2001)) (cleaned up). Courts recognize that a property owner may be excused from obtaining a

final decision if the parties have reached an impasse and further proceedings would be unproductive. *Id.* The finality requirement is a prudential rather than jurisdictional consideration and is not applied "mechanistically." *Lilly Invs.*, 674 F. App'x at 526. A challenge to the validity of an ordinance "as applied" is subject to the rule of finality, "which is concerned with whether the government entity charged with implementing the ordinance has reached a final decision regarding the application of the ordinance to the property at issue." *V. Jacobs & Sons v. Saginaw Cnty. Dept. of Public Health*, 284 F. Supp. 2d 711, 718 (E.D. Mich. 2003). Facial challenges are not subject to this rule "because such challenges attack the very existence or enactment of the ordinance itself." *Id.*

PLD explains that it intends to raise both a facial and as-applied challenge as a means of handling the unique circumstances presented by the Ordinance, which applies by its terms only to the Clubhouse Parcel. The City argues that PLD should have applied for a variance to establish the City's precise position as to multifamily development on the Clubhouse Parcel. But PLD points out that the Chattanooga Board of Zoning Appeals lacks authority to modify zoning conditions placed on a property by ordinance of the City Council, citing City of Chattanooga Code of Ordinances § 38-563(6). [Doc. 87 at 16]. The City does not respond to this contention.

In *Williamson*, the Supreme Court of the United States held that a takings claim[8] was not ripe because the plaintiff had "not yet obtained a final decision regarding the application of the ordinance and regulations to its property, nor utilized the procedures Tennessee provides for obtaining just compensation." *Williamson*, 473 U.S. 173.[9] Here, Plaintiff knows how the

---

[8] The parties agree that the finality doctrine applies to both takings and equal protection claims. [Doc. 92 at 20; Doc. 110 at 16-17, 20].

[9] The exhaustion requirement was subsequently eliminated by the Court in *Knick v. Township of Scott*, 139 S. Ct. 2162 (2019).

19

Ordinance will be applied to its property, because the Ordinance applies only to its property. What Plaintiff cannot know is how the City Council might view an application to rezone the Clubhouse Parcel for a particular use. The focus of the disparate treatment inquiry is thus not a prohibition on multifamily development of the Clubhouse Parcel, but on the specific harm allegedly worked by the Ordinance – rezoning from C-2 to C-2 with conditions.

The City's position on the how the Ordinance will apply to the Clubhouse Parcel is sufficiently crystallized to enable the Court to effectively review PLD's equal protection challenge. The finality doctrine is, moreover, prudential. And as explained below, Plaintiff's equal protection claims cannot survive summary judgment for substantive reasons.

3. Rational Basis

"Under rational basis review, the defendant 'has no obligation to produce evidence to sustain the rationality of its actions; its choice is presumptively valid and may be based on rational speculation unsupported by evidence or empirical data.'" *Loesel*, 692 F.3d at 465. The plaintiff bears the burden of showing the absence of a rational basis for the government action, and can do so "either by negativing every conceivable basis which might support the government action or by demonstrating that the challenged government action was motivated by animus or ill-will." *Id.* (quoting *Warren v. City of Athens*, 411 F.3d 697, 711 (6th Cir. 2005)). To survive summary judgment, the plaintiff "must show that the adverse treatment they experienced was so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government's actions were irrational." *Id.* at 462 (*quoting Rondigo, LLC v. Town of Richmond*, 641 F.3d 673, 682 (6th Cir. 2011)); *see also Forseth v. Village of Sussex*, 199 F.3d 363, 370-71 (7th Cir. 2000) (*quoting Esmail v. Macrane*, 53 F.3d 176, 180 (7th Cir. 1995) ("Absent a fundamental right or a suspect class, to demonstrate a viable equal protection claim in the land-use

context, the plaintiff must demonstrate governmental action wholly impossible to relate to legitimate governmental objectives.").

PLD does not contend that the City was motivated by personal animus, so it must rebut any conceivable basis which might support the City Council's enactment of the Ordinance. [Doc. 87 at 2; Doc. 110 at 14]. Though the Court views the facts in the light most favorable to PLD in evaluating the City's motion, PLD as plaintiff bears the burden of demonstrating the absence of a rational basis for the City's action. *Loesel*, 692 F.3d at 465. PLD has not carried this burden.

The City contends that the Ordinance (i) preserves 38 years of past and present use, (ii) responds to the neighboring property owners' concerns and opposition to multifamily housing, (iii) preserves the unique character of the community, and (iv) corrects an invalid 2002 rezoning by restoring the land to the use it had prior to that zoning. [Doc. 92 at 19]. PLD counters that none of the reasons offered by the City are rationally related to the conditions added to the Clubhouse Parcel's zoning. There is a genuine dispute of fact as to the first three reasons offered by the City. This dispute is not material, however, because correcting the 2002 Notice was a rational basis for the Ordinance.

The Sixth Circuit's rational basis analysis in *Loesel v. City of Frankenmuth*, 692 F.3d 452 (6th Cir. 2012), is instructive. There, the court found sufficient evidence for a jury to conclude there was no rational basis for a size-cap ordinance enacted by the City of Frankenmuth and the Frankenmuth Township that had prevented Wal-Mart from building a supercenter. *Id.* About 15 acres of the Loesels' property was zoned Commercial Local Planned United Development (CL-PUD), while the remaining 22 acres was zoned residential. *Id.* at 455. Plaintiffs entered into a conditional agreement to sell part of the land to Wal-Mart. *Id.* at 456. Wal-Mart submitted a proposed site plan that appeared to be permissible under the existing zoning. *Id.* City officials

understood the proposed store to be a 104,000 square-foot center. *Id.* at 457. As here, members of the community organized to oppose the development. *Id.*

The following month, at the suggestion of the City's Planning Commission, the City passed a 120-day moratorium on the construction of any facility with an area of 70,000 square feet or more. *Id.* City officials then turned to crafting a Neighborhood Commercial Overlay Zone, which would limit the size of retail establishments to 65,000 square feet. *Id.* at 458. The City is bisected by Genesee Street running east to west. *Id.* at 459. South of Genesee Street sits Bronner's, the world's largest year-round Christmas store, drawing two million visitors annually. *Id.* at 455. Officials were concerned about how the ordinance would impact this and other large commercial establishments south of Genesee Street. *Id.* at 459. So, one version of the ordinance applied only to the northern part of the town, while one applied to the whole. North of Genesee Street, however, there was a Bavarian-themed mall with a Kroger. *Id.* Even if the ordinance applied only to the northern part of town, officials worried that Kroger would not be able to expand. *Id.*

A third version of the ordinance was thus drafted which shrank the size of the affected area to include only properties with CL-PUD zoning, a move that excluded the Kroger / the Bavarian Mall and Bronner's Christmas Store. *Id.* The result was that the ordinance only applied to the Loesels' property and several much smaller parcels in its immediate vicinity, while everything just south of the Loesels' property was unaffected. *Id.* This version of the ordinance was ultimately adopted. *Id.* Because it was no longer feasible to build the facility given the 65,000 square foot restriction, Wal-Mart exercised its option to terminate the purchase agreement. *Id.* at 460.

The Loesels sued and their facial equal protection challenged was submitted to a jury, who returned a verdict for the Loesels. *Id.* at 460-61. The City filed a renewed motion for judgment as a matter of law, which the district court denied and the City appealed.

On appeal, the City argued that the testimony of its municipal-land-use expert demonstrated that a rational basis existed for applying the size limit only to CL-PUD-zoned properties. *Id.* at 465. The expert testified the property was unsuitable for a large, big-box retail store because of its inadequate depth, close vicinity to residential property, inadequate traffic capacity and parking space, and potential storm-water retention issues. *Id.* The expert also identified about a dozen parcels within the urban growth area that were better suited for development of a big-box store than the subject property. *Id.* He testified that the planned supercenter would be more appropriate in the "CT-PUD" zoned properties in the southern part of town, rather than the CL-PUD district in the northern end. *Id.* He explained that a store of the planned size normally requires a population of at least 30,000 and the City and Township had less than 7,000 residents, while the southern part of town served many visitors. *Id.* The expert further testified that there could be negative consequences to applying the size limit to Bronner's and the Bavarian Mall, zoned B-3, because they already exceeded that size limit. *Id.* at 465-66. "One such consequence would be that an existing building exceeding the new size limit would be considered 'non-conforming' and, although the structure could remain as is, the property owner would be unable to enlarge the existing structure without receiving a variance from the zoning board." *Id.* at 466.

The Loesels argued that the expert's opinions were undercut on cross-examination and by other testimony. The Sixth Circuit did not evaluate every contention by the City's expert and its purported contradiction. Instead, the court noted, "for example," that the expert had conceded that he did not know whether the parcels that he identified in the southern end of the City were available for sale, what the uses of the properties were, or whether any had undeveloped wetlands or appropriate road access. *Id.* The City Manager had also contradicted the expert's opinion that the

23

City's growth plan called for growth on the southern rather than northern end of town. *Id.* In fact, it expressly contemplated additional local commercial establishments in the northern area of the city. *Id.* Accordingly, the Sixth Circuit found that the jury could have rejected the expert's testimony and that a genuine dispute existed as to whether the ordinance lacked a rational basis.

Applying the reasoning of *Loesel* here, there is a genuine issue of fact as to whether the Ordinance was rationally related to quelling neighborhood opposition to multifamily housing and preserving the unique character of the residential community. According to PLD, the Ordinance is not rationally related to these ends because the Ordinance paves the way for more intensive uses of the Property than were previously permitted. [Doc. 87 at 5; Doc. 110 at 5, 9-10]. The record reflects that the Clubhouse Parcel is in a predominantly residential area, with single family residences on Reads Lake Road. [Doc. 75-4 at 19; Doc. 75-6 at 30]. Prior to the Ordinance, the Parcel's C-2 zoning permitted residential development. Now, the Parcel's zoning permits uses under the former C-1 zone, plus offices and a clubhouse. As conditioned, residential development is impermissible. [Doc. 75-6 at 32-33]. Bryan Shults testified that from a planning standpoint, removing general residential uses from the property probably did not make sense. [Doc. 75-4]. John Bridger testified that though the Clubhouse Parcel "should never have been zoned C-2 to begin with," [*Id.* at 35], "[f]rom a general land-use planning perspective, you would want to allow some kind of residential use" [*Id.* at 33].

While it removes residential use from the Clubhouse Parcel zoning, the Ordinance permits uses that are arguably more disruptive of the character of the neighborhood, including restaurants, hotels, automobile service stations, billboards, bowling alleys, and train stations. [Doc. 75-9 at 3]. Both Bryan Shults and John Bridger testified that many of these uses would be incompatible with either the immediately adjacent property or surrounding area. [Doc. 75-4 at 14; Doc. 75-6 at 25-

27]. Bridger also testified that generally, the ten principal uses in the C-1 zone were likely to generate more traffic than residences. [Doc. 75-6 at 29].

On the other hand, the City argues that the conditions imposed "removed many commercial and residential uses from the C-2 zoning, not just residential, making it a less intensive zoning." [Doc. 92 at 5]. Shults testified that C-2 zoning allows more uses than C-1. [Doc. 83-11 at 3, pg. 107]. Similarly, Henderson testified that one of the reasons he wanted to add C-1 conditions to the C-2 zoning was to make it a less intensive zone. [Doc. 75-8 at 25]. And an unconditioned C-2 zone already permits uses similar to those permitted in C-1, including retail and service establishments, bakeries, delis, bowling alleys, banks, office buildings, restaurants, hospitals, and commercial signs and billboards. [Doc. 83-38 at 1]. Accordingly, there is a fact issue as to whether the Ordinance permitted more intense commercial uses of the property than were permitted prior to the Ordinance. Whether the Ordinance was rationally related to responding to neighboring property owners' opposition to multifamily housing and preserving the unique character of the community cannot be decided on this record.

Similarly, there is a question as to whether preserving the current and former use of the Clubhouse Parcel was a rational basis for the Ordinance. PLD says it was not, because PLD owned the Clubhouse Parcel prior to the enactment of the Ordinance so the prior owner's use was irrelevant. [Doc. 87 at 8]. But rezoning a property to exclude existing uses may well have other legal consequences. The City argues it was attempting to avoid compromising the owner's subsequent use, while returning the Parcel to its pre-2002 zoning.

The City has advanced one interest, however, that is rationally related to the Ordinance: correcting the 2002 Notice. When several hundred properties were rezoned as part of a revision to the Chattanooga City Code in 2002, the legal notice of rezoning did not identify the location of

any property included in the rezoning. [Doc. 83-28 at 1]. Based on the notice, the public would not have been able to determine which properties were being rezoned. [*Id.*]. Instead, "all of them were done the same as a general legal ad in the paper." [Doc. 75-6 at 19]. The record reflects that Councilman Henderson believed the notice of rezoning was legally inadequate because no adjacent property owner was notified of the change. While he opined that "[a]nything other than R-1 is not consistent with land uses," [Doc. 87-2], he sought to put the C-1 conditions on the Clubhouse Parcel on the advice of his attorney. [Doc. 75-8 at 26]. The Sixth Circuit has acknowledged that reliance on a professional's recommendation in making a decision provides a conceivable basis to reject a class of one claim. *See Shavers*, 832 F. App'x at 938 (citing *Superior Commc'ns v. city of Riverview*, 881 F.3d 432, 447 (6th Cir. 2018)). Believing the 2002 Notice to be inadequate, the Ordinance was an "attempt to right a wrong" [Doc. 75-8 at 6].

Similarly, John Bridger testified they were "dealing with technical legal issues of notification and trying to restore the zoning back to what it was prior to when the C-2 zoning occurred." [Doc. 75-6 at 13]. He explained that "I think what they were trying to do was . . . provide the range -- the full range of uses allowed in the C-1, add the current use of the property, offices, as part of that." [*Id.* at 12]. Because the purpose of the rezoning was to address the notification issue, the RPA was not asked to do a staff analysis of the zoning change. [*Id.* at 7-8].

PLD does not dispute that correcting the 2002 Notice is a legitimate interest.[10] It argues only that the Ordinance was not rationally related to this interest because the City did not take action on any other properties that were rezoned following the allegedly deficient 2002 Notice. [Doc. 87 at 5-6]. PLD argues "there is no <u>credible</u> evidence in the record that Defendants did

---

[10] Though PLD does not concede that the Notice was improper, [Doc. 87-5], the Court does not need to make a legal determination as to its sufficiency. The evidence is sufficient to support a "rational speculation" that the 2002 Notice warranted correction. *See Loesel*, 692 F.3d at 465.

anything to determine if only the Pratt Property merited correction." [Doc. 87 at 6].[11] But the Court does not weigh the evidence or determine the credibility of witnesses on a motion for summary judgment.

The City explains that it addressed only the Clubhouse Parcel because "rezoning the property which had raised the concerns of the surrounding neighbors . . . was the simplest method of resolving the issue." [Doc. 82 at 9]. The affidavits of neighboring property owners show that they found out about the Clubhouse Parcel's zoning at or around the time PLD held a community meeting to discuss development. [Doc. 83-1 at 2, ¶ 5; Doc. 83-2 at ¶ 4; Doc. 83-3 at ¶ 5; Doc. 83-4 at ¶ 4]. PLD's plans also led Henderson to investigate the zoning history, prompting action on the 2002 notice. [Doc. 75-8 at 38; Doc. 83-12 at 3-4, pgs. 76-78]. He testified he was not concerned about the other pieces of property because he "had nobody complaining about the fact that they were rezoned to C-2." [Doc. 75-8 at 38]; *see Cunningham v. Bedford Cnty*, No. M2017-00519-COA-R3-CV, 2018 WL 5435401, *4 (Tenn. Ct. App. Oct. 29, 2018) ("Factually based neighborhood opposition to [a] request, articulated through statements made before the Commission, is part and parcel of the consideration of rezoning requests."). The proposed development alerted community members to the zoning of the Parcel, so correcting the rezoning that enabled the very type of development they opposed was a logical response to both the opposition and the defective zoning notice. In short, the City corrected the 2002 Notice where it had caused problems.

---

[11] Specifically, PLD challenges as "ludicrous" the City's reliance on affidavits of community organizers. [Doc. 87 at 6, n. 12]. The affidavits are made by members of the Friends of Mountain Creek organization, who undertook to determine whether any of the other properties subject to the 2002 mass rezoning were also surrounded by residential development. [Docs. 83-1, 83-2, 83-3, 83-4, 83-5, & 83-6]. According to PLD, the affiants are biased, none are land planning professionals, and the search revealed some properties that were both rezoned to C-2 commercial and adjacent to residentially zoned properties. [*Id.*]. PLD cites no authority to support its argument that these affidavits must be disregarded. Nonetheless, the Court has not relied on the affidavits insofar as they opine on the comparative characteristics and locations of the other properties rezoned in 2002.

Moreover, the record indicates that the City did in fact look into the other properties involved in the 2002 Rezoning. Bridger believed that "most of those other properties were already in a commercial area, so there was not an issue as it related to a commercial zone in the middle of a residential area." [Doc. 75-6 at 20]. He recalled that the City Attorney asked staff to look into the other properties that were subject to the 2002 Rezoning to see if there were any similar situations. [Doc. 75-6 at 18]. While he was not directly involved in that research, he understood there was some investigation, and it was determined that no additional action was needed. [*Id.* at 20]. PLD challenges Bridger's testimony because he did not personally conduct the investigation and thus was not familiar with the other properties. [Do. 87 at 6]. But Bridger did not testify as to the contents of the investigation, only that one occurred and no further action was taken.

Finally, PLD says that correcting the 2002 rezoning notice was a "contrived excuse" for the City's actions. [Doc. 75-1 at 13]. PLD hypothesizes that if the City Council "actually intended" to correct the notice or was "truly concerned," it would have or should have addressed all affected properties. [*Id.* at 13-14]. In short, PLD implies that correction of the 2002 Notice was a pretext for preventing the proposed development of the Clubhouse Parcel. But the question is not whether the proffered reason was the real reason. "[T]he 'true' purpose of the policy, (i.e., the actual purpose that may have motivated its proponents, assuming this can be known) is irrelevant for rational basis analysis." *FM Properties Operating Co. v. City of Austin*, 93 F.3d 167, 174-75 (5th Cir. 1996) (*quoting Smithfield Concerned Citizens for Fair Zoning v. Town of Smithfield*, 907 F.2d 239, 246 (1st Cir. 1990)) (discussing substantive due process analysis) (cleaned up). Rather, "[t]he question is only whether a rational relationship exists between the policy and a *conceivable* legitimate governmental objective." *Id.* Moreover, the minutes of the October 9, 2018 City Council Meeting reflect concern and questions were raised regarding the 2002 rezoning notice. [Doc. 83-

33 at 3-4]. At the meeting, Bridger explained that in 2002, it would have been standard procedure to list an address in a legal notice of rezoning. [*Id.*]. City Attorney Phillip Noblett also "explained the reason why the ordinance was developed," discussing the 2002 rezoning.[12] [*Id.*].

On rational basis review, it is not the Court's role to evaluate the competing interests of property owners, neighbors, and the larger community to find the best, most narrowly-tailored compromise. That is instead the quintessential role of a local legislative body. "Legislators . . . do what legislators do: they listen to their constituents, they test the wind; they try to please as many people as possible, consistent with the constitution and good conscience. And they are not to be condemned for doing so. That is their job." *Cunningham*, 2018 WL 5435401 at *4. Only where the government's adverse treatment of an individual is "so unrelated to the achievement of <u>any combination</u> of legitimate purposes" can the Court conclude that the government's actions were irrational. *Loesel*, 692 F.3d at 462 (*quoting Rondigo, LLC v. Town of Richmond*, 641 F.3d 673, 682 (6th Cir. 2011)) (emphasis added); *Fallin v. Knox Cnty.*, 656 S.W.2d 338, 342 (Tenn. 1983) ("Legislative classification in a zoning law, ordinance or resolution is valid if any possible reason can be conceived to justify it." (citation omitted)).

Viewing the facts in the light most favorable to Plaintiff as the non-moving party, Plaintiff has not carried its burden of negativing every conceivable basis for the Ordinance. The City has advanced a legitimate purpose or combination of purposes that form a rational basis for the Ordinance: correcting a rezoning notice in response to neighborhood opposition to the development permitted by that rezoning. *See MC Properties, Inc. v. City of Chattanooga*, 994 S.W.

---

[12] The minutes indicate that he explained that "all notices, except this one property, had the street address published in the 2002 notices." [Doc. 83-33 at 4]. To be clear, different notices in the same publication identified the properties to be rezoned by address. The mass rezoning legal ad did not state the address of any property subject to rezoning, identifying only "assorted properties." [Doc. 83-26].

2d 132, 135 (Tenn. Ct. App. 1999) ("The City advanced several reasons why the Council properly denied the change of zoning. They may not be good reasons, but this is not for the Court to determine so long as the issue is fairly debatable."). PLD does not dispute that this is a legitimate government purpose, and the Court finds the Ordinance is rationally related to this purpose. Accordingly, PLD's motion for summary judgment will be **DENIED**. The City is entitled to summary judgment as to PLD's equal protection claims, which will be **DISMISSED**.

### 4. Disparate Treatment as Compared to Similarly Situated Persons

Because Plaintiff cannot overcome rational basis review, the Court need not determine whether the Plaintiff was treated differently than those similarly situated in all material respects. Though the City moves for summary judgment on Plaintiff's equal protection claim, it does not explicitly present argument that PLD cannot satisfy the similarly-situated element of its claim. [Doc. 92 at 18-22]. The City oppose PLD's request for summary judgment by differentiating the Clubhouse Parcel from comparators proposed by PLD. [13] [Doc. 82 at 9]. Nonetheless, the Sixth Circuit has held that plaintiffs "have the burden of demonstrating that they were treated differently than other property owners who were similarly situated in all material respects." *Loesel*, 692 F.3d at 462 (articulating standard on review of defendant's renewed motion for judgment as a matter of law); *see also Trihealth, Inc. v. Bd. of Comm'rs*, 430 F.3d 783, 790 (6th Cir. 2005) ("Materiality is an integral element of the rational basis inquiry."). PLD has not shown that it was treated differently than similarly situated properties or property owners, and its motion for summary judgment may be denied on this basis alone.

---

[13] According to PLD, the City does not dispute that PLD has been treated differently from similarly situated comparators. [Doc. 110 at 14]. Yet the City's response brief clearly argues (i) that the parcel's prior zoning was specifically based on the owner's use of the property, and (ii) that the other parcels involved in the 2002 rezoning "were located adjacent mainly to commercial properties and no neighborhood concerns from surrounding single family neighbors were raised to the City council." [Doc. 82 at 9].

"[T]he basis for any equal protection claim is that a locality has treated similarly situated individuals differently." *Braun v. Ann Arbor Charter Twp.*, 519 F.3d 564, 575 (6th Cir. 2008) (dismissal appropriate where plaintiff failed to allege specific examples of similarly situated individuals, "let alone evidence of situations where the proposed rezoning was similar in scale or impact"). A plaintiff "must show that they were treated differently than those similarly situated in all material respects." *Loesel*, 692 F.3d at 462. "In determining whether individuals are 'similarly situated,' a court should 'not demand exact correlation, but should instead seek relevant similarity.'" *Id.* (*quoting Bench Billboard v. City of Cincinnati*, 675 F.3d 974, 987 (6th Cir. 2012)); *Trihealth*, 430 F.3d at 790 ("Materiality is an integral element of the rational basis inquiry . . . Disparate treatment of persons is reasonably justified if they are dissimilar in some material respect."). Because it is fact-specific, determining whether individuals are similarly situated is generally a fact issue for the jury. *Loesel*, 692 F.3d at 463. The Sixth Circuit has cautioned that the similarly-situated analysis "should be framed in terms of the properties and their owners, not in terms of the stores located on those properties." *Id.*

Here, Plaintiff asserts that the facts are undisputed and thus there is no question for the jury to decide. [Doc. 87 at 3]. PLD argues that regardless of whether compared to all property in the City of Chattanooga, all commercially-zoned property in the City, or just property zoned C-2, Defendants singled out the Clubhouse Parcel for "downzoning" to Plaintiff's detriment. [Doc. 75-1 at 10-11]. Plaintiff makes a number of factual claims in this regard, many of which are not supported by the record.[14] None of these claims establish that the Clubhouse Parcel was similarly

---

[14]     For example, Plaintiff states that "[u]nlike every other zoning case, in this case, the Defendants actually directed the planning department <u>not to</u> prepare a staff report containing analysis and recommendations for the rezoning application." [Doc. 75-1 at 11]. In fact, Bridger testified that the City Council did not request an analysis, not that it affirmatively instructed the RPA not to prepare a staff report. [Doc. 75-6 at 7-9].

        PLD also claims that the Clubhouse Parcel "was the only property in the City where the City stripped away all residential uses," citing the deposition testimony of Henderson and Shults. [Doc. 75-1 at 11]. But Henderson was

situated in all material respects to any other property or group of properties. The question is not just whether PLD was treated differently, but whether it was treated differently as compared to similarly-situated property owners. These comparators must be identified.

Plaintiff urges that the Clubhouse Parcel is similarly situated to other C-2 properties in Chattanooga that are surrounded by residential zoning. [Doc. 87 at 3]. To support this assertion, Plaintiff submits "zoning maps, address maps, and google maps" that appear to show several C-2 properties in residential areas in the City of Chattanooga. [Doc. 87-1]. The documents submitted by Plaintiff are insufficient to establish that any of the referenced properties are similarly situated to the Clubhouse Parcel. The composite exhibit includes what appear to be printed zoning maps for several parcels and Google Maps printouts showing images of the properties. The source of the zoning maps is not clear and they are not dated. The Google Maps printouts are from June 2020. The materials are not authenticated or accompanied by a declaration or other explanatory material and they do not set out the zoning history of any given parcel. They do not identify the use of the properties, the property owner, whether the properties are for sale, whether there is proposed development on the properties, whether the buildings / businesses are in operation, or the size of any parcel. Neither the exhibit nor the briefing indicates whether the properties were part of the

---

only asked whether there was any other parcel in the City that has its use limited to office use and uses consistent with former C-1 zone. [Doc. 75-8 at 24]. He responded that "this is unique, as every other C-2 with conditions is unique." [*Id.*]. Shults was asked the same question and responded: "I couldn't answer that. During my time, I can't think of any." [Doc. 75-4 at 13]. Neither of these record citations support the claim that "Pratt's was the only property in the City where the City stripped away all residential uses." [Doc. 75-1 at 11].

Similarly, PLD contends that the Parcel "is the only commercial property in the City to have been completely downzoned sua sponte by the City." [Doc. 87 at 3]. The record cited does not support this statement. It indicates instead that in his six years on City Council, Henderson personally had not previously introduced a resolution to downzone a property, had not seen others do so, had not seen the City as an applicant for rezoning, and could not recall a rezoning that was not accompanied by an RPA staff recommendation. [Doc. 75-8 at 31-35].

2002 rezoning.[15] Plaintiff does not explain how these properties are similar to the Clubhouse Parcel in any respect, except that they were at some point zoned C-2 and adjacent to residentially-zoned properties. Plaintiff's proffered evidence is thus insufficient to establish salient similarity to the Clubhouse Parcel.

Plaintiff also argues the Clubhouse Parcel was similarly situated to the other properties that were rezoned to C-2 in 2002. [Doc. 75-1 at 12]. According to PLD, "[n]othing distinguished any property rezoned from C-1 to C-2 in 2002 from another, including the Pratt Property," yet the Clubhouse Parcel was the only property the City later downzoned to remove residential uses. [*Id.*]. Plaintiff contends that "[t]he only aspect of these properties that matters is that prior to 2002 they were zoned C-1, and after 2002, they were zoned C-2," but cites no supporting legal authority. [Doc. 87 at 3]. To the contrary, the law is clear that "a comparator business must be similar in 'all relevant respects.'" *Paterek*, 801 F.3d at 650 (finding triable issue where plaintiff pointed to multiple businesses allowed to operate under similar circumstances while plaintiff was not) (*quoting United States v. Green*, 654 F.3d 637, 651 (6th Cir. 2011)).

The record shows that the Clubhouse Parcel was uniquely zoned long before 2002 and therefore was not necessarily similarly situated to the other properties caught up in the mass rezoning. The 1977 change from R-1 Residential – the zoning of the remainder of the golf course – to R-4 Special Zone was made at the owner's request to accommodate offices and a clubhouse. [Doc. 83-9 at 1]. Similarly, the 1980 rezoning from R-4 to C-1 was made at the request of the owner so that he could have a bar in the clubhouse. [Doc. 83-14 at 3]. Henderson testified that this zone "was not in character with the R-1 zoning that was around it." [Doc. 75-8 at 23].

---

[15] The Court has no obligation to scour the record to find support for a parties' argument. Nonetheless, the Court reviewed the list of properties rezoned from C-1 or C-6 to C-2 [Doc. 75-5] and was unable to locate any of the addresses in Plaintiff's exhibit, namely Ziegler Street, West Bell Avenue, and Harrison Pike.

In recommending the change, the staff noted that the zoning was not in accordance with the land use plan, stating:

> **We consider this an isolated case with very unusual circumstances** which warrant favorable consideration; however, we are in no way condoning general commercial zoning for this area. This is still a residential neighborhood and we would hope that any future cases would be considered under their own merit without this action being an influencing factor.

[Doc. 83-14 at 3] (emphasis added).

Thus, the zoning history of the Clubhouse Parcel suggests it was zoned at the behest of the owner, based on the owner's unique use of the property rather than the development in the area. Because the zoning reflects specific concessions to the owner's unique use of the property, its inclusion in the 2002 rezoning does not establish that it was similarly situated to all other properties zoned C-1 or C-6 at that time. As discussed above, the record also reflects that during or after 2018, the City Attorney asked RPA staff to look into the other properties in the 2002 rezoning to determine if there were any similar situations. [Doc. 75-6 at 18]. John Bridger testified that "most of those other properties were already in a commercial area, so there was not an issue as it related to a commercial zone in the middle of a residential area." [Doc. 75-6 at 20]; *see Shavers v. Almont Twp.*, 832 F. App'x 933, 938 (6th Cir. 2020) (rejecting plaintiff's contention that other projects with similar issues were approved, because "whether he received disparate treatment is separate from whether there is a rational reason supporting that disparate treatment").

In short, Plaintiff has produced no evidence of the ownership, characteristics, use, or zoning history of any specific property or group of properties to compare to the Clubhouse Parcel. Indeed, it has scarcely identified a comparator property or property owner. The fact that the Clubhouse Parcel was zoned C-1 prior to 2002 does not establish that sixteen years later it was similarly situated to one or more of the 600 properties that were also zoned C-1 or C-6 in 2002. Without

34

some evidence of relevant similarity, Plaintiff simply cannot show that PLD or the Clubhouse Parcel were similarly situated in all material respects to any given property or property owner.

As to PLD's motion for summary judgment, the Court views the facts in the light most favorable to the City as the non-moving party. In this light, PLD has not shown that it was treated differently as compared to other properties or property owners that were similarly situated in all material respects. Accordingly, and in the alternative, PLD's motion for summary judgment as to its equal protection claim will be **DENIED**.

### D. "Spot-Zoning" Equal Protection Argument

Plaintiff also moves for summary judgment on its equal protection claim on the basis that adding conditions to the Clubhouse Parcel's zoning constituted "spot-zoning." [Doc. 75-1 at 16]. The City argues that labelling an action spot-zoning does not render it unconstitutional. The Court agrees.

Spot zoning generally occurs when an ordinance singles out a piece of land for the benefit of the owner, giving the owner privileges not granted to others similarly situated, and not in furtherance of any general plan or scheme of zoning. *See Grant v. McCullough*, 270 S.W.2d 317, 319 (Tenn. 1954). Yet Tennessee law is clear that "spot zoning is not per se illegal." *Crockett v. Rutherford Cnty.*, M2000-01405-COA-R3-CV, 2002 WL 1677725, *3 (Tenn. Ct. App. March 17, 2003). Rather, "[s]pot zoning is only illegal if it is arbitrary, capricious, unreasonable, or violates a state statute or constitutional guaranty." *Id.*; *Fielding v. Lynchburg*, No. M2011-00417-COA-R3-CV, 2012 WL 327908, *3 (Tenn. Ct. App. Jan. 31, 2012) (same). "In addressing a claim of spot zoning, the most important factor is whether the rezoned land is being treated unjustifiably different from the surrounding land, thereby creating an island having no relevant differences from its neighboring property." *Fielding*, 2012 WL 327908 at *3 (*quoting Quoc Tu Pham v. City of*

*Chattanooga*, No. E2008-02410-COA-R3-CV, 2009 WL 2144127 (Tenn. Ct. App. July 20, 2009)).

Plaintiff argues the Ordinance spot-zoned the Clubhouse Parcel and was thus illegal. But the law is clear that more is required. The cases Plaintiff relies on all analyze the rationality of the challenged zoning change. In *Grant v McCullough*, the Supreme Court of Tennessee found that "[n]o basis" for the zoning change could be "conjured" other than a desire to help the property owner. 270 S.W.2d at 319. In *Quoc Tu Pham v. City of Chattanooga*, the Court of Appeals of Tennessee held that the City's actions in rezoning part of a building to try to get rid of a tenant was clearly arbitrary, capricious, unreasonable, and had no substantial relationship to the public, health, safety, or welfare, and was clearly contrary to the zoning laws. 2009 WL 2144127 at *4. The *Crockett v. Rutherford County* court likewise looked to whether any possible reason could be conceived to justify the County's rezoning of a piece of land to permit erection of a radio tower. 2002 WL 1677725 at *4.

In short, the "spot zoning" label does not alter the Court's equal protection analysis. Whether the Parcel was spot-zoned in 1977, 1980, 2002, or 2018, the Court has held that there was a rational basis for the City Council's enactment of the Ordinance in 2018.

### E. Substantive Due Process Claims

For the same reasons that Plaintiff has failed to show the City Council's actions lacked a rational basis, Plaintiff cannot demonstrate that the enactment of the Ordinance arbitrarily and capriciously deprived it of a constitutionally protected property interest. Substantive due process in the zoning context "protects citizens from being subject to 'arbitrary or irrational zoning decisions.'" *Paterek v. Village of Armada*, 801 F.3d 630, 648 (6th Cir. 2015). To prevail on a substantive due process claim, a plaintiff must show that (1) a constitutionally protected property

or liberty interest exists, and (2) the constitutionally protected liberty interest has been deprived through arbitrary and capricious action. *Id.* The Court will not interfere with local zoning decisions "unless the locality's action has no foundation in reason and is a mere arbitrary or irrational exercise of power." *Id.* (*quoting Warren v. City of Athens*, 411 F.3d 697, 707 (6th Cir. 2005)).

The City does not argue that Pratt lacked a sufficient property interest in the Clubhouse Parcel or its zoning to sustain a substantive due process claim. The disputed issue is whether that interest was deprived through arbitrary and capricious action, such that Plaintiff's substantive due process rights were violated.

"The Tennessee Supreme Court has often stated that the due process clause of the Tennessee Constitution is synonymous with the due process clause of the Fourteenth Amendment to the United States Constitution." *Consolidated Waste Sys., LLC v. Metropolitan Gov't of Nashville and Davidson Cnty.*, No. M2002-02582-COA-R3-CV, 2005 WL 1541860, *6 (Tenn. Ct. App. June 30, 2005). Accordingly, Tennessee courts "have applied the same substantive due process analysis as is applied in such challenges brought under the federal Constitution." *Id.* Moreover, nothing in the parties' briefing indicates a significant distinction between the state and federal analyses. The Court will therefore evaluate Plaintiff's substantive due process claims under the United States Constitution and Tennessee Constitution together.

The substantive due process analysis is, in turn, substantially similar to the rational basis review applicable to Plaintiff's class-of-one equal protection claim. In the zoning context, where no personal animus or protected class is alleged, the Sixth Circuit has collapsed or equated the two standards of review on numerous occasions. *See Schenck v. City of Hudson*, 114 F. 3d 590, 594 (6th Cir. 1997) ("[T]o survive a substantive due process challenge, [the ordinance] must merely be rationally related to its purpose."); *Pearson*, 961 F.2d at 1216 ("[Plaintiff's] equal protection

claim is of the economic variety (no racial or other suspect class overtones), which tends to merge with the substantive due process argument."); *Shavers*, 832 F. at 940 ("Having concluded that the Township's actions survive rational basis scrutiny we hold . . . that he cannot establish the required 'arbitrary and capricious action' necessary for his substantive-due-process claim."). Tennessee courts have done the same, holding that "[t]he rational basis analysis used in an equal protection challenge does not differ in substantial regard from the rational basis test used when considering a substantive due process claim." *Consolidated*, 2005 WL 1541860 at *7 (addressing equal protection and substantive due process claims together).

Likewise, the parties' substantive due process arguments are essentially the same as their equal protection / rational basis test arguments. The City argues that "[g]iven the unusual history of the property, the City's action in returning the zoning to its pre-2002 status served to maintain the character of the neighborhood, do no harm to the property owners, and eliminated the possibility of multifamily in accord with the neighbor's concerns." [Doc. 92 at 16]. Again, PLD does not dispute the legitimacy of these government interests. Rather, it argues the City's enactment of the Ordinance was not rationally related to these interests. [Doc. 110 at 9-10]. These arguments fail for the reasons articulated in the equal protection analysis. Nonetheless, the Court will address the principal cases cited by PLD in support of its substantive due process claim.

First, *Johnson v. City of Saginaw*, 980 F.3d 497 (6th Cir. 2020) and *Johnson v. Morales*, 946 F.3d 911 (6th Cir. 2020) involved the same plaintiff and incident. After a gunfight in front of Rita Johnson's restaurant, the city suspended her business license and turned off her water. The cases did not involve zoning. In analyzing plaintiff's substantive due process claims, the Sixth Circuit stated that the "City's action is only <u>rationally related</u> to promoting public health, morals,

safety, or welfare if it somehow deters or prevents conduct that threatens those interests." *Johnson v. City of Saginaw*, 980 F.3d at 514 (emphasis added); *Johnson v. Morales*, 946 F.3d at 938.

Next, in *Crockett v. Rutherford County*, the County rezoned 3 acres of land to allow the owner to lease it to Moody Bible Institute, which intended to erect a 500-foot-tall radio tower. 2002 WL 1677725 at *2. The County rezoned the property from residential use to "Commercial 4899," a zoning classification that did not exist in the County Zoning Resolution. *Id.* It came instead from a Standard Industrial Classification Manual. *Id.* The County argued that the zoning change was not arbitrary and capricious because, *inter alia*, it was the best site for Moody's construction of a radio tower, met the requirements for Moody's intended use, had a road and drainage system already in place, and allowed Moody to reach targeted areas without interference. *Id.* The Tennessee Court of Appeals found that while these reasons explained Moody's desire to rent the property from the Plaintiff, the rezoning had no relation to the public health, safety, or welfare. *Id.* at *4-5. In other words, the rezoning in *Crockett* served private ends, rather than legitimate government interests. Here, PLD does not dispute that the City's proffered reasons reflect legitimate government interests. *Crockett* does not speak to PLD's central contention that the Ordinance was not rationally related to the City's reasons for enacting it.

More to the point, in *Consolidated Waste Systems, LLC v. Metropolitan Government of Nashville and Davidson County*, the court observed that "as in the substantive due process challenge, the zoning ordinances must be reviewed under the rational basis test." 2005 WL 1541860 at *7. In *Consolidated*, the Metropolitan Government of Nashville and Davidson County passed two amendments to its zoning ordinance that regulated the location of construction and demolition ("C&D") landfills in the county. *Id.* at *1. The first bill prohibited a C&D landfill from being located within two miles of a school or park, but applied only to zoning districts where a

C&D landfill was permitted as a special exception or with certain conditions. *Id.* at *2. The second ordinance made C&D landfills permissible in specific zoning districts only with conditions and also extended the two-mile buffer to all C&D landfills regardless of zoning. *Id.*

Plaintiff Consolidated Waste Systems, LLC, had leased with an option to purchase property in Davidson County for the purpose of developing such a landfill. *Id.* at *1. The property was located within two miles of a park, so the ordinances had the effect of preventing development of a landfill. *Id.* at *3. Consolidated challenged the ordinances on substantive due process and equal protection grounds. *Id.* at *4. It argued that the ordinances required a two-mile buffer for C&D landfills and not for other types of landfills and noxious facilities, and that the Metropolitan Government had not articulated a rational basis for this distinction.

The Court of Appeals of Tennessee agreed. *Id.* at *35. The Metropolitan Government did not dispute that other types of landfills and facilities posed a greater health and safety risk than C&D landfills, and could not explain why only C&D landfills must be located more than two miles from parks and schools. *Id.* The court found that C&D landfills did not pose as great a risk to public welfare as other types of landfills and similar facilities and that the Metropolitan Government could not justify its imposition of stricter location requirements for them. *Id.* It also found that there was no planning policy basis for choosing two miles as opposed to any other particular distance and no proof that the buffer would meet its stated goals of protecting parks and schools from dust, noise, and truck traffic. *Id.* It therefore affirmed the trial court's holding that the ordinances violated the plaintiff's substantive due process and equal protection guarantees. *Id.*

Construing the facts in the light most favorable to PLD as the non-moving party, PLD cannot show that the City Council's enactment of the Ordinance was arbitrary and capricious. PLD persuasively argues that the Ordinance was not rationally related to preventing multifamily

40

housing because it removed all residential uses from a property surrounded by residential development but left intensive commercial uses available. The City responds that in addition to addressing neighborhood opposition to multifamily housing, it sought to address a defective rezoning notice. PLD argues the Ordinance cannot be rationally related to this purpose either because it applied to only one property, not the hundreds of other properties that were subject to the allegedly deficient notice of rezoning. PLD likens this case to *Consolidated*, where the defendant could not explain why the two-mile buffer was more appropriate than any other distance or why it applied to C&D landfills and not to other types of equally or more hazardous landfills.

But unlike the defendant in *Consolidated*, the City has offered at least two plausible explanations for its singular action on the Clubhouse Parcel. First, the City offers some evidence that action was only necessary as to the Clubhouse Parcel because most of the other properties rezoned in 2002 were not in residential areas to begin with. The zoning history of the property explains how this anomalous situation might have arisen. PLD challenges the affidavits of community members regarding their personal investigation of the other properties, and also challenges Bridger's testimony on this score. But Bridger and others testified that the City undertook some investigation and determined no action was needed as to the other properties impacted by the 2002 rezoning. [Doc. 75-6 at 18]. Bridger understood this was because most other properties were located in commercial areas. [Doc. 75-6 at 20]. While PLD notes that some of the properties researched by FOMC were adjacent to residentially-zoned properties, it also urges the Court not to consider those affidavits. [Doc. 87 at 6].

While the City's evidence may be slim, there is nothing on the other side of the scale – PLD has presented no evidence to put the fact of an investigation into dispute. Nor does it dispute that most of the other rezoned properties were not in predominately residential areas. There is no

Case 1:19-cv-00010-CEA-SKL   Document 118   Filed 01/21/22   Page 41 of 56   PageID #: 1367

evidence to suggest that similar community opposition arose elsewhere and was ignored. The only evidence in the record on this issue indicates that (i) most of the other properties subject to the 2002 rezoning were already in commercial areas, and (ii) the City conducted some investigation of these properties. PLD presents no contrary proof and accordingly, there is no fact dispute.

A second rationale for acting only on the Clubhouse Parcel is the community opposition to multifamily development, development that was only possible because of the improperly-noticed rezoning. Property owners who lived near the Clubhouse Parcel prior to the 2002 rezoning aver that if they had received notice of the rezoning, they would have publicly opposed it at the time and recruited others to do the same [Doc. 83-1 at ¶ 6; Doc. 83-4 at ¶ 5]. A later resident avers she and her husband would have reconsidered building their home on Quarry View Road if they had known that the Clubhouse Parcel was zoned C-2, allowing construction of apartments. [Doc. 83-3 at 2]. Relatedly, John Bridger testified that the Clubhouse Parcel "should never have been zoned C-2 to begin with" and that he would have been concerned about an application to rezone the property to C-2. [Doc. 75-6 at 35]. The improperly-noticed rezoning was thus related to community opposition to multifamily development – residents opposed C-2 zoning and had no chance to voice that opposition before they were impacted by it. Meanwhile, no one complained about other rezoned properties. Acting only on a zoning change that incited opposition comports with the purpose of rezoning notices – to give the community the chance to be heard on land use decisions in their area.

The City has advanced several reasons why the Council properly rezoned the Clubhouse Parcel. The City Council could have rationally speculated that the 2002 Notice was deficient. Based on that rational speculation, it could have concluded that community opponents of multifamily development were deprived of their right to object to the rezoning that permitted that

development. The Ordinance ameliorated the impact of the 2002 Notice by returning the Parcel to its prior zoning, but adding the owner's subsequent use of the property. Viewing the undisputed facts in the light most favorable to PLD, PLD cannot show the Ordinance was clearly arbitrary and unreasonable. The City is entitled to judgment in its favor and Plaintiff's state and federal substantive due process claims and request for declaratory judgment based on those claims will be **DISMISSED**.

### F. Procedural Due Process Claims

The City moves for summary judgment as to PLD's procedural due process claims under state and federal law, and as to PLD's request for declaratory judgment that the City violated its vested property rights by enacting the Ordinance. [Doc. 92 at 10]. The City argues that PLD lacked a vested property right in the zoning of the Clubhouse Parcel and that it was provided with notice and an opportunity to be heard on the change. [Doc. 92 at 10, 13-14]. PLD contends that it had a protectable interest in the C-2 zoning unless and until the City complied with the planning, notice, and hearing requirements of Tennessee law. PLD contends it was denied the right to a meaningful hearing because of "the City's district friendly voting procedures." [Doc. 110 at 22].

To establish a procedural due process violation under 42 U.S.C. § 1983, a plaintiff must prove:

> (1) that it had a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment; (2) that it was deprived of that protected interest within the meaning of the due process clause; and (3) that the state did not afford it adequate procedural rights before depriving it of its protected interest.

*Wedgewood Ltd. P'ship I v. Township of Liberty*, 610 F.3d 340, 349 (6th Cir. 2010). A party obtains a protected property right under the Fourteenth Amendment when it can demonstrate a legitimate claim of entitlement or a justifiable expectation in the approval of a building plan. *Id.*

Initially, the parties disagree about the starting point for the analysis. The City contends that a plaintiff must have a vested right in a property's zoning to state a procedural due process claim. [Doc. 92 at 10]. PLD disagrees, arguing that under *Wedgewood v. Township of Liberty*, it does not have to have a "vested right" to assert a procedural due process claim. [Doc. 110 at 21]. According to PLD, the relevant question is whether the City "had the authority to do what it did." [Doc. 110 at 21]; *Wedgewood*, 610 F.3d at 353. The Court does not read *Wedgewood* so broadly.

In *Wedgewood*, the plaintiff sought rezoning to develop a retail store and the Township denied approval. *Id.* at 343. The Township later issued "zoning instructions" that functionally amended the zoning of Wedgewood's property without notice or a hearing. *Id.* Plaintiff argued it could state a procedural due process claim because it had a property interest in the subject property's prior zoning. *Id.* at 352. The Sixth Circuit began by explaining that property interests are created not by the Constitution, but by independent sources such as state law. *Id.* Thus, "[i]n determining whether Wedgewood established a vested property interest, we must look to substantive state zoning laws." *Id.* at 349 (*quoting Dorr v. City of Ecorse*, 305 F. App'x 270, 275 (6th Cir. 2009)). The court concluded that the rezoning did not comply with Ohio's notice and hearing requirements. *Id.* at 353. It found Wedgewood had a "justifiable expectation" that its zoning classification was vested "unless and until the Commission and Trustees passed an amendment" to the zoning in accordance with Ohio law. *Id*. *Wedgewood* thus confirms that the analysis begins with state law.

The Court turns, then, to Tennessee zoning law. "It is well settled that rights under an existing ordinance do not vest until substantial construction or substantial liabilities are incurred relating directly to that construction." *State ex. Rel. SCA Chem. Waste Servs., Inc.*, 636 S.W. 2d 430, 437 (Tenn. 1982); *Pep Prods. v. Town of Farragut*, No. 1399, 1991 WL 50211, *2 (Tenn. Ct.

App. Sept. 9, 1991) ("Tennessee has consistently adhered to the rule that private rights do not vest until substantial construction or substantial liabilities have been incurred."); *accord Capps v. Metropolitan Gov't of Nashville and Davidson Cnty.*, No. M2007-01013-COA-R3-CV, 2008 WL 5427972, *12 (Tenn. Ct. App. Dec. 31, 2008).

The City argues that Tennessee law does not recognize property rights in an existing zoning ordinance, standing alone. [Doc. 92 at 10]. Rather, the issuance of a building permit and / or substantial construction is required. [*Id.*]. The City relies principally on *Westchester Co., LLC v. Metropolitan Gov't of Nashville and Davidson County*, No. M2004-02391-COA-R3-CV, 2005 WL 3487804 (Tenn. Ct. App. Dec. 20, 2005), which bears a striking similarity to the instant case.

There, plaintiff Westchester Company purchased land zoned RM20 on May 1, 2003. *Id.* at *1. The same day, the plaintiff entered a contract to sell the property for development of multi-family townhouses. *Id.* Westchester twice confirmed with the Metropolitan Government of Nashville and Davidson County ("Metro") that the property was properly zoned RM20, that it could be developed as residential multi-use property, and that there was no error in the zoning. *Id.*

Shortly after purchasing the property, Westchester was notified of a proposed zoning change to RS20, which permits only single-family dwellings. *Id.* On June 26, 2003, less than two months after Westchester's purchase, the Planning Commission held a meeting on the change. *Id.* The minutes reflect that "the property in question had been mistakenly rezoned to RM20 in 1998 and that the zone change legislation which is the subject of this lawsuit . . . was designed to correct that error and put the zoning classification back to RS20." *Id.* Westchester appeared and spoke in opposition to the zoning change. *Id.* The Planning Commission unanimously approved the "zoning correction," and the property was rezoned to RS20. *Id.* at *2. The parties stipulated that at a meeting with council members, neighbors, and representatives of the Metropolitan Government,

"it was apparent that the zoning change was made in order to prohibit the construction of town homes which were to be built in accordance with the RM20 zoning ordinance in place at the time of the execution of the contract for sale." *Id.* Because of the change, Westchester could not deliver the property for the use implicitly warranted. *Id.* Westchester sued, seeking, *inter alia*, a declaratory judgment that it had a vested right in the previous zoning classification. *Id.* The trial court found for Metro and dismissed the suit. *Id.*

On appeal, the Court of Appeals of Tennessee found that it was undisputed that construction of the town houses had not commenced, so there was no "substantial construction" sufficient to vest rights in an existing ordinance. *Id.* at 3. Second, the court rejected Westchester's contention that lost profits and / or its possible liability for breach of contract could constitute "substantial liabilities . . . related directly to construction." *Id.* Instead, the court characterized such expenses as "losses/liabilities incurred in relation to the holding of investment property." *Id.* at 4.

PLD contends that it incurred "substantial liabilities" in developing the Pratt Property after purchase, including more than $100,000 on engineering, soil testing, and surveying services. [Doc. 110 at 23]. But Tennessee courts have rejected the argument that similar expenses constitute substantial liabilities in the vested rights analysis. Rather, "[i]t is clear that the liability incurred must be, literally, directly related to construction," *Capps*, 2008 WL 5427972 at *12, and "[p]re-construction or planning costs do not meet the criteria," *Jones v. City of Milan*, 1985 WL 4309, at *2 (Tenn. Ct. App. W.S. Dec. 9, 1985).

Numerous cases illustrate the point. In *Capps v. Metropolitan Government of Nashville and Davidson County*, the court opined that costs incurred to demolish the inside of a building, survey the property, and for architectural planning were pre-construction or planning costs and therefore did not constitute "substantial liabilities" that would give rise to a vested right in an

existing building permit. 2008 WL 5427972 at *11. The court also noted that the plaintiff "was aware that her permit was being challenged and subject to revocation" before she began construction and thus could not claim she incurred substantial liabilities "in good faith reliance" on the later-revoked building permit. *Id.* at *3.

In *Chickering Ventures*, 1988 WL 133527, at *3 (Tenn. Ct. App. 1988), the plaintiff obtained a building permit for duplexes and spent $17,000 in clearing the lot and pouring concrete footings. *Id.* The Court of Appeals concluded that the $17,000 in costs was "not substantial enough" to give rise to a vested right in the building permit. *Id.*; *see also Haymon v. City of Chattanooga*, 513 S.W.2d 185, 187 (Tenn. Ct. App. 1973) ($35,000 for constructing a foundation for an apartment building held insufficient to give property owner vested right to continue construction); *Jones v. City of Milan*, 1985 WL 4309 at *2 (monies spent in preparation for building apartments and architectural fees in anticipation of application and building were not "substantial liabilities").

*Westchester* and *Pep Products* apply the same vested rights analysis to the zoning context. In *Pep Products*, 1991 WL 50211 at *2, the plaintiff asserted that while construction had not commenced, it had incurred $13,000 in preliminary expenses generally incidental to the project. *Id.* The record indicated that a contractor had been at the property to commence site preparation and that "some minimum earth moving had begun" but was "too insignificant to consider." *Id.* at *2, n.2. The court found these were preliminary expenses and insufficient confer a vested right in the zoning. The court also noted that not all of the expenses identified were directly attributable to the project. *Id.* at *2.

In support of its contention that it incurred "substantial liabilities" in developing the Pratt Property after purchase, PLD submits a document entitled "Total Cash Outlays for the Quarry

47

Project." [Doc. 110-8 at 2-4]. The list of incurred expenses begins on October 23, 2017, about two months prior to when PLD entered into an agreement to purchase the property (contingent on zoning) and nearly seven months prior to the May 18, 2018 closing on the purchase. [*See* Doc. 75-2 at 8]. It includes sections for Due Diligence, Land Purchase, Legal / Engineering Due to Down Zoning, and Engineering / Surveying. [Doc. 110-8 at 2-4].

Initially, the overwhelming majority of these expenses are clearly not directly related to construction, for example, pre-purchase agreement site planning for the initial zoning request, "legal fees related to fighting City Council's Downzoning," and the purchase price for the Quarry Golf Course Property. As to expenses for site planning, surveying, and similar preparatory work, Tennessee courts have rejected the argument that such expenses are directly related to construction. More importantly, the chart reflects total cash outlays for the Quarry Project. PLD makes no effort to identify which expenses comprise the $100,000 it alleges it spent on engineering, soil testing, and surveying. Thus, as in *Pep Products*, the Court cannot determine which of these expenses, if any, are attributable to the Clubhouse Parcel rather than the larger Quarry Golf Course Property.

Though not strictly necessary to the analysis, the Court also observes that PLD knew that the City Council was considering adding conditions to the Clubhouse zoning when it closed on the purchase of the property. [Doc. 75-2 at 7]. "If the city or the neighbors take an appeal alleging invalidity of the permit or the underlying law on which it is based, expenses incurred during the appeal will not be made in good faith." *Capps*, 2008 WL 5427972 at *12 (*citing* Julian Conrad Juergensmeyer & Thomas E. Roberts, *Land Use Planning & Dev. Regulation Law* § 5.28 (2003)). Additionally, PLD President Win Pratt testified that had the PUD been approved for building apartments on the Clubhouse Parcel, PLD "would not do any improvements on the clubhouse

portion of the property." [Doc. 83-25 at 9]. PLD would not prepare the land for vertical construction, but simply transfer the title to another entity for development. [*Id.*].

While the Court construes the evidence in the light most favorable to the non-movant, the City's motion for summary judgment points to the absence of evidence to support an element of PLD's procedural due process claim. Specifically, the absence of evidence that PLD incurred substantial liabilities related to construction on the Clubhouse Parcel such that it obtained a vested right in the Parcel's prior zoning. To survive summary judgment, PLD must come forward with more than a scintilla of evidence to support this element. It has not done so. PLD has presented no evidence of (i) substantial liabilities that are (ii) directly related to construction and (iii) attributable in whole or part to the Clubhouse Parcel. "The effectiveness of a legally-valid zoning change can only be thwarted by a finding of a vested right in the previous zone, a right that simply does not exist in this case." *Westchester*, 2005 WL 3487804 at *4.

Even assuming, *arguendo*, that PLD had a vested right in the unconditioned C-2 zoning of the Clubhouse Parcel, PLD has not presented any evidence that it was deprived of notice and an opportunity to be heard. "[T]he exercise of power in a manner that targets or singles out a property owner, without more, has not been recognized by the Sixth Circuit as a violation of procedural due process in the land use context." *Center for Powell Crossing, LLC v. City of Powell*, 173 F. Supp. 3d 639, 666 (S.D. Ohio 2016). Rather, the Sixth Circuit has held that "the right to a hearing is triggered" where "a government unit singles out and specifically targets an individual's property for a zoning change." *Nasierowski Bros. Inv. Co. v. City of Sterling Heights*, 949 F.2d 890, 896 (6th Cir. 1991); *Wedgewood*, 610 F.3d at 354 (acknowledging this reasoning as persuasive).

PLD does not dispute that it received actual notice of a hearing and an opportunity to be heard. Rather, it contends the City Council had "district friendly voting procedures" that "mean

49

that Council Members simply vote in line with the Council member whose district the property is located in, and members do not conduct their own evaluation of the merits of the case." [Doc. 110 at 22]. PLD cites Henderson's testimony that on rezoning matters, "the council does put merit on the opinion of the councilperson in that district, since they are ultimately more familiar with their constituents and the desires in representing their wishes." [Doc. 83-12 at 15].[16] Similarly, Bridger testified that the City Council "in practice" defers to the recommendation of the City Councilman in whose district the property is located when considering such ordinances. [Doc. 110-2 at 3-4].

Construed in the light most favorable to PLD, these facts are insufficient to establish that PLD was deprived of a meaningful opportunity to be heard. Even assuming the City Council defers to the recommendation of the member whose district is impacted by a zoning application, PLD has not produced any evidence that it did so in this case. Nor has it pointed to case law that acknowledges a deprivation of procedural due process based on a generalized tendency to defer to a local councilmember.[17] To the contrary, the record establishes that PLD knew about and attended public hearings regarding the rezoning Ordinance, including a September 10, 2018 Planning Commission hearing and an October 9, 2018 City Council meeting. [Docs. 83-32 & 83-33]. Two representatives of PLD spoke in opposition to the Ordinance at each meeting. [*Id.*]. On the first reading, the Ordinance did not pass unanimously, demonstrating that councilmembers did not

---

[16] PLD also claims "Henderson cannot recall a rezoning application for a property in his district where his position did not receive majority support from Council." [Doc. 110 at 22-23]. The cited deposition testimony does not support this statement, referring to a question from PLD's counsel, not a statement by Henderson. [*See*. Doc. 110-3 at 3].

[17] Plaintiff cites two cases on this topic, neither of which require a different result. In *Mator v. City of Ecorse*, 301 F. App'x 476, 480 (6th Cir. 2008), plaintiffs' properties were designated as vacant via placard, and they were prohibited from using the properties without a variance. They had no opportunity to oppose the designation and there was no hearing. *Id.* at 478. In *Hillside Productions, Inc. v. Duchane*, 249 F. Supp. 2d 880, 896 (E.D. Mich. 2003), the court found a deprivation of procedural due process where the city planner had privately reviewed evidence with city councilmembers regarding the revocation of a special land use permit and had acted as a prosecutor of the revocation.

simply defer to Henderson. [Doc. 83-33 at 6].[18] PLD's evidence of bias is little more than speculation. Accordingly, PLD's procedural due process claim and requests for declaratory judgment premised on its procedural due process claim will be **DISMISSED**.

### G. Taking / Inverse Condemnation Claim

"The Takings Clause of the Fifth Amendment provides that private property shall not 'be taken for public use, without just compensation.'" *Murr v. Washington*, 137 S. Ct. 1933, 1942 (2017). The Supreme Court of the United States has recognized several types of takings claims. *Andrews v. City of Mentor*, 11 F.4th 462 (6th Cir. 2021). A traditional takings claim is based on "direct government appropriation or physical invasion of private property." *Id.* (*quoting Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537 (2005)). Second, a "total regulatory taking" occurs where a land-use regulation "'deprives the land of all economically beneficial use,' leaving the land 'economically idle.'" *Id.* (*quoting Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992)). Finally, even where a regulation leaves some economically beneficial use of the property, a taking may still be found based on a "complex of factors, including (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the government action." *Id.* (*quoting Murr*, 137 S. Ct. at 1943) (internal quotation omitted). The Supreme Court of Tennessee has held that "article I, section 21 of the Tennessee Constitution encompasses regulatory takings to the same extent as the Takings Clause of the Fifth Amendment to the United States Constitution." *Phillips v. Montgomery Cnty.*, 442 S.W.3d 233, 244 (Tenn. 2014).

PLD first contends it has suffered a total regulatory taking because it has been deprived of all economically beneficial use of the Clubhouse Parcel. PLD contends the Clubhouse Parcel has

---

[18] The minutes memorializing the second reading of the Ordinance do not indicate whether there were any votes against passing it, only that the motion carried with two abstentions. [Doc. 83-34].

no value because it cannot be used for residential purposes and none of the permitted commercial uses are viable. It cites the testimony of the principals of PLD, James Pratt and Win Pratt, who started the Pratt Companies in the 1990s. [Doc. 110-6 at 3]. James Pratt testified that he believed the City's actions rendered the property worthless and he could not think of any valuable use of the property other than residential. [Doc. 110-6 at 5-6]. He conceded, however, that the property has been used for years as an office and thus has some "very limited" use. [*Id.* at 25]. Pressed further, he testified the property was not practical for any type of office use and it would be hard to use for anything other than some type of residential. [*Id.*]. Win Pratt likewise testified that he considered the property worthless and that he could not see any scenario for developing it with its current zoning. [Doc. 110-7 at 4]. Likewise, PLD submits the affidavit of real estate broker Jay Robinson, who avers that the Ordinance has rendered the Clubhouse Parcel unmarketable. [Doc. 110-1 at ¶¶ 3, 13]. Robinson further avers that the Clubhouse Parcel "has only nominal value and it has no value for anything other than greenspace." [*Id.* at ¶ 13].

Second, PLD contends that the Ordinance has had a dramatic economic impact on PLD and interfered with its distinct investment-backed expectations,[19] namely, to develop the Clubhouse Parcel as apartments. [Doc. 110 at 19]. PLD contends that the "nonsensical" character of the City's action also supports its claim that there was a taking. [*Id.*]. PLD points to the testimony of John Bridger and Bryan Shults that most of the uses permitted by the ordinance are incompatible with the surrounding area. [*Id.* at 19-20; *see* Doc. 75-4 at 14; Doc. 75-6 at 25-27]. Finally, PLD points to the affidavit of Jay Robinson that these uses are not viable or marketable. [Doc. 110 at 20].

---

[19] Though Plaintiff contends it paid $1.5 million for the Quarry Golf Course Property [Doc. 110 at 19], which includes the Clubhouse Parcel, the record does not reflect which of the Pratt Companies paid for the property. Pratt Homebuilders, LLC, who is not a party to this action, executed the Commercial Purchase and Sale Agreement as the buyer [Doc. 83-16] and the Property was deeded to PLD [Doc. 83-23].

The City argues that PLD's property has not been taken from it because the current uses are consistent with the historical uses of the property. [Doc. 92 at 22]. The City asserts that several other permissible uses "are certainly compatible," including churches, a small drugstore, gift shop, guesthouse, small hotel, offices, and restaurant use. [*Id.*]. As PLD notes, the City fails to cite to any portion of the record in support of this argument. [Doc. 110 at 19-20; Doc. 92 at 22]. In fact, Bryan Shults testified that many of the uses permitted by the Ordinance would not be compatible with immediately adjacent property. [Doc. 75-4 at 14]. He testified churches could be compatible, as could drugstores or gift shops, depending on the scale and density level. [*Id.* at 15]. Similarly, John Bridger testified that churches would be compatible with the surrounding area, but that a number of other uses would not be, including restaurants, automobile service stations, billboards, bus terminals, train stations, and bowling alleys. [Doc. 75-6 at 25-27]. Neither testified as to the value of the Clubhouse Parcel.

The City further argues that because there has been no final decision by the City regarding the use of the Clubhouse Parcel, the claim is premature under *Williamson*. Because the Plaintiff has not filed a request with the City to develop the Clubhouse Parcel since the Ordinance was enacted, the City argues that the extent to which the Plaintiff can use the property has not been determined. But as the Court has explained, PLD has "obtained a final decision regarding the application of the ordinance . . . to its property," *see Williamson*, 473 U.S. 173, because the Ordinance applied only to its property. And the Sixth Circuit has very recently noted that "the status of the prudential ripeness doctrine is uncertain," declining to apply it *sua sponte* to a takings claim. *F.P. Dev., LLC v. Charter Twp. of Canton*, 16 F.4th 198, 203 (6th Cir. 2021).

Finally, the City argues that Count X of the Complaint alleges a violation of Tennessee's inverse condemnation statute, T.C.A. § 29-16-123. [Doc. 92 at 23]. According to the City, the

statute does not provide a freestanding remedy, but a means of obtaining a damage remedy for a constitutional violation. [*Id.*]. PLD does not respond to this argument, stating only that the Supreme Court of Tennessee has recognized that the Tennessee Constitution and the inverse condemnation statute "enacted to implement the constitutional provision" encompass regulatory takings to the same extent as the Fifth Amendment to the United States Constitution. [Doc. 110 at 18]. Because the Court finds that the City has not carried its burden on summary judgment, the Court need not decide whether this statutory provision provides for a remedy or independent cause of action.

There is a genuine dispute of material fact as to whether the Ordinance deprived PLD of some or all economically beneficial use of the Clubhouse Parcel. The City presented no evidence on this score, while PLD points the Court to specific evidence in the record that the Clubhouse Parcel now has no or nominal value. On this record, the City has not carried its burden of demonstrating the absence of any genuine issue of material fact as to PLD's takings claim under the Tennessee Constitution and its summary judgment motion must be **DENIED**. Because there is a triable issue as to Plaintiff's regulatory takings claim, the Court has no occasion to address whether a partial regulatory taking has occurred.

## H.  Declaratory Judgment

Count I seeks a declaratory judgment finding the Ordinance invalid and returning the Parcel to its prior zoning classification. [Doc. 1-1 at ¶ 65]. This request for declaratory judgment is premised on the City's alleged violation of PLD's equal protection, substantive due process, takings, and procedural due process claims. [*Id.* at ¶¶ 61-64]. Because the City is entitled to summary judgment as to PLD's equal protection, substantive due process, and procedural due process claims, declaratory judgment will be **DENIED** in this respect.

Count II seeks a declaratory judgment that Plaintiff is entitled to develop the Clubhouse Parcel in accordance with the uses permitted by the C-2 Convenience Commercial Zone, based on Plaintiff's assertion that it has a vested right in the Clubhouse Parcel's prior zoning. [*Id* at ¶¶ 71-72]. Because Plaintiff has not established a vested right in the Clubhouse Parcel's unconditioned C-2 zoning, its request for declaratory judgment on this basis is **DENIED** and Count II of the Complaint is **DISMISSED**.

## IV.    CONCLUSION

Accordingly, it is hereby **ORDERED** that Plaintiff Pratt Land & Development, LLC's Motion for Summary Judgment [Doc. 75] and Plaintiff's Motions for Hearing [Docs. 78 & 111] are **DENIED**.

The First Motion for Summary Judgment [Doc. 91] of Defendants City of Chattanooga and the Chattanooga City Council is **GRANTED IN PART** as follows:

- All claims against the Chattanooga City Council are **DISMISSED**;

- Plaintiff's substantive due process claims under the United States Constitution and Tennessee Constitution (Counts III & IV) are **DISMISSED**;

- Plaintiff's equal protection claims under the United States Constitution and Tennessee Constitution (Counts V & VI) are **DISMISSED**;

- Plaintiff's procedural due process claims under the United States Constitution and Tennessee Constitution (Counts VII & VIII) are **DISMISSED**;

- Plaintiff's Count I, seeking a declaratory judgment invalidating the Ordinance and returning the Parcel to its prior zoning classification is **DISMISSED IN PART** insofar as it seeks relief based on Plaintiff's equal protection, substantive due process, and procedural due process claims;

55

- Plaintiff's Count II, seeking a declaratory judgment that Plaintiff is entitled to develop the Clubhouse Parcel in accordance with the uses permitted by the C-2 Convenience Commercial Zone, based on a vested right in the Clubhouse Parcel's prior zoning is **DISMISSED**; and

- Because no claims under 42 U.S.C. § 1983 remain before the Court, Plaintiff's prayer for attorneys' fees under 28 U.S.C. § 1988 in Count XI is **DISMISSED**.

Defendant's First Motion for Summary Judgment [Doc. 91] is **DENIED IN PART** as to all remaining counts and claims. Remaining before the Court, then, are:

- Count I, seeking declaratory judgment that the Ordinance is invalid as an unconstitutional taking of PLD's property and that the Parcel is returned to its prior zoning classification;

- Count IX, Plaintiff's takings clause claim under the Tennessee Constitution; and

- Count X, Plaintiff's inverse condemnation claim pursuant to Tennessee Code Annotated § 29-16-123.

**SO ORDERED**.

*/s/ Charles E. Atchley, Jr.*
CHARLES E. ATCHLEY, JR.
UNITED STATES DISTRICT JUDGE